# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF OREGON

| | |
|---|---|
| IN RE: INTEL CORP. CPU MARKETING, SALES PRACTICES AND PRODUCTS LIABILITY LITIGATION<br><br>———————————————————<br><br>This Document Relates to All Actions. | Case No. 3:18-md-2828-SI<br><br>**OPINION AND ORDER GRANTING MOTION TO DISMISS WITH LEAVE TO AMEND** |

Christopher A. Seeger, SEEGER WEISS LLP, 55 Challenger Road, Ridgefield Park, NJ 07660; Rosemary M. Rivas, GIBBS LAW GROUP LLP, 505 14th Street, Suite 1110, Oakland, CA 94612; Steve D. Larson and Jennifer S. Wagner, STOLL STOLL BERNE LOKTING & SHLACHTER PC, 209 SW Oak Street, Suite 500, Portland, OR 97204; Gayle M. Blatt, CASEY GERRY SCHENK FRANCAVILLA BLATT & PENFIELD LLP, 110 Laurel Street, San Diego, CA 92101; Stuart A. Davidson, ROBBINS GELLER RUDMAN & DOWD LLP, 120 East Palmetto Park Road, Suite 500 Boca Raton, FL 33432; Melissa R. Emert, KANTROWITZ, GOLDHAMER & GRAIFMAN, P.C., 747 Chestnut Ridge Road, Suite 200, Chestnut Ridge, NY 10977; Richard M. Hagstrom, HELLMUTH & JOHNSON PLLC, 8050 West 78th Street, Edina, MN 55439; Jennifer L. Joost, KESSLER TOPAZ MELTZER & CHECK LLP, One Sansome Street, Suite 1850, San Francisco, CA 94104; Adam J. Levitt, DICELLO LEVITT & CASEY LLC, Ten North Dearborn Street, 11th Floor, Chicago, IL 60602; and Charles E. Schaffer, LEVIN SEDRAN & BERMAN LLP, 510 Walnut Street, Suite 500, Philadelphia, PA 19106. Of Attorneys for Plaintiffs.

Daniel F. Katz, David S. Kurtzer-Ellenbogen, David Krinsky, and Samuel Bryant Davidoff, WILLIAMS & CONNOLLY LLP, 725 Twelfth Street NW, Washington, D.C. 20005; and Steven T. Lovett and Rachel C. Lee, STOEL RIVES LLP, 760 SW Ninth Avenue, Suite 3000, Portland, OR 97205. Of Attorneys for Defendant.

**Michael H. Simon, District Judge.**

In this multidistrict proceeding, Plaintiffs bring a putative nationwide class action against Defendant Intel Corporation (Intel) relating to certain security vulnerabilities in Intel's microprocessors. Plaintiffs allege that Intel knew for decades about certain design defects in its microprocessors that created security vulnerabilities and that Intel failed to disclose or mitigate these vulnerabilities. Plaintiffs further allege that the ways in which these security vulnerabilities could be exploited became publicly known beginning in January 2018, with new ways continuing to be discovered and publicized. These forms of exploit have become generally known as "Spectre," "Meltdown," "Foreshadow," "ZombieLoad," "SwapGS," "RIDL," "LazyFP," "CacheOut," and "Vector Register Sampling," among others. Plaintiffs contend that until Intel fixes the alleged defects at the hardware level, additional ways to exploit these security vulnerabilities will likely continue to be discovered.

Intel previously moved to dismiss this action, and the Court granted that motion with leave to amend. *See In re Intel Corp. CPU Mktg., Sales Practices & Prod. Liab. Litig.*, No. 3:18-MD-2828-SI, 2020 WL 1495304 (D. Or. Mar. 27, 2020). Plaintiffs then filed an Amended Consolidated Class Action Allegation Complaint (Amended Complaint) (ECF 181), and Intel has moved against that pleading. In their Amended Complaint, Plaintiffs allege that Intel's processors have two primary design defects. First, the design of the processors heightens the risk of unauthorized access to protected memory secrets. Second, the design does not completely delete, or undo, the memory's recent retrieval of those secrets, also increasing the risk of unauthorized access. Plaintiffs contend that these design defects create security vulnerabilities that could lead to a breach of confidential data. Plaintiffs also allege that Intel cannot fix these defects after-the-fact, and that the software patches created or distributed by Intel to mitigate these defects substantially diminish the speed of Intel's processors.

Based on the alleged defects and Intel's allegedly inadequate and untimely disclosures and responses, Plaintiffs assert the following nationwide class claims: (1) fraud by concealment or omission; (2) breach of California's Consumers Legal Remedies Act (CLRA), Cal. Civ. Code §§ 1750, *et seq.*; (3) breach of California's Unfair Competition Law (UCL), Cal. Bus. & Prof. Code §§ 17200, *et seq.*; (4) breach of California's False Advertising Law (FAL), Cal. Bus. & Prof. Code §§ 17500, *et seq.*; and (5) unjust enrichment, or quasi-contract. Plaintiffs also assert separate state subclass claims for each state except California, Kentucky, and Massachusetts, plus the District of Columbia, under each jurisdiction's deceptive or unfair trade practices act or consumer protection law. Plaintiffs seek both money damages and injunctive relief.

Against the Amended Complaint, Intel challenges Plaintiffs' nationwide class claims, Counts I-V, which Intel argues under California law.[1] Intel asserts that Plaintiffs fail to state a claim for fraud and that Plaintiffs may not pursue equitable remedies under California statutes because Plaintiffs allege legal remedies. Intel also contends that Plaintiffs fail to state a claim for unfair or unlawful trade practices and for unjust enrichment or quasi-contract. Intel also challenges Plaintiffs' state subclass claims. Intel argues that Plaintiffs fail to state a claim for any of the six bellwether state counts that the parties agreed to litigate in the pending motion.[2] For the reasons explained below, the Court grants Intel's motion to dismiss the Amended Complaint.

---

[1] Intel adds that it reserves the right to argue at a later time that California law does not govern claims asserted by persons who are not residents of California.

[2] The parties chose Plaintiffs' claims under the Florida Deceptive and Unfair Trade Practices Act (FDUTPA), the Illinois Consumer Fraud and Deceptive Business Practices Act (ICFA), the New Jersey Consumer Fraud Act, (NJCFA), the New York General Business Law (NYGBL), the Ohio Consumer Sales Practices Act (OCSPA), and the Texas Deceptive Trade Practices Act (TDTPA).

**STANDARDS**

A motion to dismiss for failure to state a claim may be granted only when there is no cognizable legal theory to support the claim or when the complaint lacks sufficient factual allegations to state a facially plausible claim for relief. *Shroyer v. New Cingular Wireless Servs., Inc.*, 622 F.3d 1035, 1041 (9th Cir. 2010). In evaluating the sufficiency of a complaint's factual allegations, the court must accept as true all well-pleaded material facts alleged in the complaint and construe them in the light most favorable to the non-moving party. *Wilson v. Hewlett-Packard Co.*, 668 F.3d 1136, 1140 (9th Cir. 2012); *Daniels-Hall v. Nat'l Educ. Ass'n*, 629 F.3d 992, 998 (9th Cir. 2010). To be entitled to a presumption of truth, allegations in a complaint "may not simply recite the elements of a cause of action, but must contain sufficient allegations of underlying facts to give fair notice and to enable the opposing party to defend itself effectively." *Starr v. Baca*, 652 F.3d 1202, 1216 (9th Cir. 2011). The court must draw all reasonable inferences from the factual allegations in favor of the plaintiff. *Newcal Indus. v. Ikon Office Sol.*, 513 F.3d 1038, 1043 n.2 (9th Cir. 2008). The court need not, however, credit the plaintiff's legal conclusions couched as factual allegations. *Ashcroft v. Iqbal*, 556 U.S. 662, 678-79 (2009).

A complaint must contain sufficient factual allegations to "plausibly suggest an entitlement to relief, such that it is not unfair to require the opposing party to be subjected to the expense of discovery and continued litigation." *Starr*, 652 F.3d at 1216. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678 (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007)). "The plausibility standard is not akin to a probability requirement, but it asks for more than a sheer possibility that a defendant has acted

unlawfully." *Mashiri v. Epstein Grinnell & Howell*, 845 F.3d 984, 988 (9th Cir. 2017) (quotation marks omitted).

## BACKGROUND

Plaintiffs' Amended Complaint is 409 pages long and contains 1,544 separately numbered paragraphs. It contains much technical detail on the many so-called exploits (or ways in which the security vulnerabilities can be exploited) that have been discovered and become publicly known during the past three years. The Amended Complaint explains how these security vulnerabilities affect Intel's microprocessors, also called "chips" or simply "processors." It also details the history of Intel's chip development and competition with Advanced Micro Devices, Inc. (AMD). In this section, the Court summarizes the facts most relevant to the pending motion.

Intel manufactures microprocessors. A microprocessor is an integrated electronic circuit that contains the functions of a central processing unit (CPU) of a computer. The CPU is the "brains" of the computing device, performing the necessary computations for programs or applications, such as Microsoft Word, and peripheral devices, such as printers. Each program communicates with a processor through instructions, with each instruction representing a calculation or operation that the CPU must execute on behalf of the requesting program. For each calculation, the CPU "fetches" an instruction from the computer's memory, "decodes" the instruction, "executes" it, and, finally, "writes-back" the result. The time that it takes a CPU to process instructions is measured in "clock cycles." Each step in the process—fetch, decode, execute, and write-back—takes at least one clock cycle. The number of clock cycles that a CPU completes per second is known as the "clock rate." The speed of a CPU often is measured in "clock speed."

Plaintiffs allege that clock speed "is a material attribute for consumers purchasing" devices, that consumers "*really* care about speed," and that "milliseconds matter." Am. Compl.

¶¶ 454, 683, 687 (emphasis in original). Intel markets its microprocessors as having faster clock speed than the processors of its competitors (including AMD) and charges a premium for its fastest processors. To obtain higher clock speed, modern processors usually implement two techniques—branch prediction and speculative execution. These techniques allow the CPU to predict what actions might be needed, perform those actions "out of order," and later reconcile what actions were needed versus what actions were not needed and may be discarded. The CPU then properly orders the actions that were needed.

Plaintiffs allege that Intel's design implements branch prediction, speculative execution, out-of-order execution, and an unsecured cache subsystem in a way that contains the two alleged defects. The first alleged defect (Unauthorized Access) creates windows of time during which an unauthorized user could have the processor allow unnecessary or unauthorized memory access to copies of sensitive or privileged data. This essentially allows the return of "secrets" to a "transient instruction." The second alleged defect (Incomplete Undo) allows the accessed privileged information (or data about that privileged information sufficient to allow an unauthorized user to retrieve the privileged information) to remain in the CPU's cache after the mistaken or unauthorized access is discovered during the "reconciliation" step.

Processors contain, among other things, an "instruction set" and "microarchitecture." The instruction set serves as an interface between a computer's software and hardware. The microarchitecture governs the various parts of the processor and how they work together to implement the instruction set. Plaintiffs describe the history of Intel's chip development, including its changes in microarchitecture and instruction sets, which the Court need not summarize here. It is enough to say that Intel designed different privilege levels in its instruction set in its 1982 processor that protect a computer's most privileged information. In 1985 Intel

improved the functionality of key aspects of this design—protected mode and virtual memory. Plaintiffs allege that all modern processors use these functionalities. Plaintiffs also allege that when Intel incorporated branch prediction and speculative execution in its chips in 1996 with its P6 architecture, Intel's chips did not return "real values" but instead returned a random number, which was the way that AMD processors worked. Plaintiffs allege that this type of processor is not vulnerable to most of the security exploits that have been recently discovered, except for Spectre.

Plaintiffs allege that in July 1999 AMD "took the 'speed crown'" for developing a faster processor than Intel. Plaintiffs describe Intel and AMD's ongoing competition and speed "wars," and allege that Intel faced product and market difficulties for a few years. Plaintiffs allege that these problems led to Intel designing and releasing in 2006 a new chip based on a new microarchitecture that went back to its P6 microarchitecture. This new microarchitecture was called "Core." The Core chips increased the use of out-of-order execution, speculative execution, branch prediction, and cache subsystems, and significantly increased clock speed. According to Plaintiffs, Core, unlike P6, uses an allegedly unsafe practice of returning "real values" instead of dummy, or random, values, thereby creating the Intel-only Unauthorized Access defect. Thus, allege Plaintiffs, Intel made critical design choices with Core to focus on improving clock speed to the detriment of security.

Plaintiffs assert that the two alleged defects, resulting from Intel's decision to prioritize processing speed rather than security, make users' confidential information more susceptible to cache timing "side-channel attacks." Side-channel attacks are based on information gleaned from operating the computer system and are not reliant on software bugs. Plaintiffs allege that the Unauthorized Access defect has existed since 2006, and the Incomplete Undo defect has been

present for at least 20 years. Plaintiffs also allege that Intel knew that its processors had increased vulnerability to cache timing side-channel attacks resulting from these two alleged design defects. Plaintiffs further allege that the fact that *Intel's* processors were susceptible to cache timing side-channel attacks was described in highly technical literature and in Intel's patent filings beginning in the mid-1990s. Plaintiffs describe the various articles, white papers, and patent filings containing this information.

Starting in 2017, independent research teams began discovering specific processor security vulnerabilities. Plaintiffs describe these as "exploits" of the alleged defects. According to Plaintiffs, the alleged defects created the security vulnerabilities that allowed the exploits to occur. In April 2017, researchers discovered the first of a series of exploits, known as "Spectre," which comes from "speculative execution." Spectre allows for unauthorized access within the same process based on branch prediction. Spectre broadly affects processors across manufacturers.

In July 2017, researchers discovered Meltdown, an exploit that takes advantage of both Unauthorized Access and Incomplete Undo. In January 2018, a third exploit, Foreshadow, was discovered. Foreshadow also takes advantage of both Unauthorized Access and Incomplete Undo. Later in 2018, researchers discovered an exploit named "SwapGS," which was not publicly disclosed until August 2019. Plaintiffs allege that only Intel-designed chips are susceptible to SwapGS. Also in 2018, researchers began revealing a new series of exploits, categorized by Intel as "microarchitectural data sampling" or "MDS" exploits. These include RIDL (Rogue in Flight Data Load), ZombieLoad, Fallout, and CacheOut. These exploits have been described as "powerful." The MDS exploits obtain sensitive information "in flight" versus

in the cache. MDS exploits have been revealed in 2019 (LazyFP) and 2020 (CacheOut and Snoop-Assisted L1).

Plaintiffs assert that the many discovered security exploits "take advantage" of the two alleged defects in Intel's chip design. In January 2018, it was publicly revealed that Intel's microprocessors were vulnerable to the first of these security risks. Plaintiffs allege that the microprocessors made by AMD and other competitors of Intel are not vulnerable to any of these alleged exploits other than Spectre. Plaintiffs also allege that other than Spectre, the exploits result from Intel's specific microprocessor design choices. Spectre, on the other hand, is a widespread vulnerability that allegedly arises from speculative execution and branch prediction, as it generally is applied in chips and is shared by other microprocessor designs.

Plaintiffs do not allege that they, or anyone else, have had their computers breached or that any data has been compromised as a result of any of the alleged defects in Intel's CPUs, through Spectre, Meltdown, Foreshadow, or any similar exploitation of the alleged defects. Plaintiffs allege, however, that the exploits have been "weaponized 'in the wild'" and already have associated malware. Plaintiffs add that that any breach that may result in the future from any of these exploits would be undetectable.

Plaintiffs also allege that Intel's mitigation efforts, including providing software patches, leave consumers more susceptible to future security breaches, caused Plaintiffs to spend time and effort researching and implementing multiple mitigation techniques, caused freezing, crashing, and other computer performance problems, and have significantly reduced the speed or other performance features of Intel's CPUs. Plaintiffs contend that Intel has caused damage in the form of diminished value of Plaintiffs' computing devices and caused Plaintiffs to be deprived of the benefit of their bargain. Plaintiffs also assert that they would not have purchased Intel's CPUs or

would not have paid as high a price as they paid if Plaintiffs had known about the alleged defects in the Intel microprocessors that created the alleged security vulnerabilities.

## DISCUSSION

### A.  Nationwide Claims—Fraud and the California Statutes that Sound in Fraud

Plaintiffs' fraud claim alleges only concealment and omission, not affirmative misrepresentation. Intel argues that Plaintiffs have not stated a claim for fraud, and thus have not stated a claim under the CLRA, FAL, or the "fraud" prong of the UCL. Intel contends that Plaintiffs have not alleged: (1) a defect with allegations that comply with Rule 9(b) of the Federal Rules of Civil Procedure; (2) materiality; (3) reliance; or (4) a duty to disclose.[3] Because the Court concludes that Plaintiffs have not adequately alleged a duty to disclose, which is required for claims alleging concealment or omission, the Court need not address Intel's other arguments regarding fraud.

### 1.  Standards

Plaintiffs argue that they have sufficiently alleged material omissions to support claims under California's FAL, CLRA, and the fraud prong of the UCL. The CLRA prohibits "unfair methods of competition and unfair or deceptive acts or practices undertaken by any person in a transaction intended to result or that results in the sale or lease of goods or services to any consumer." Cal. Civ. Code § 1770. The UCL prohibits any "unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue, or misleading advertising." Cal. Bus. & Prof. Code § 17200. The FAL prohibits "untrue or misleading" statements in connection with the sale of real or personal property or the provision of services. Cal. Bus. & Prof. Code § 17500.

---

[3] Intel also argues that Plaintiffs fail to adequately allege a nationwide claim of affirmative misrepresentation. Plaintiffs, however, do not assert such a claim and confirmed at oral argument that they are not alleging a nationwide claim of affirmative misrepresentation.

These statutes "rely on the same objective test, that is, whether 'members of the public are likely to be deceived.'" *Bruno v. Quten Rsch. Inst., LLC*, 280 F.R.D. 524, 532 (C.D. Cal. 2011) (quoting *In re Tobacco II Cases*, 46 Cal. 4th 298, 312 (2009)). For these claims, a plaintiff must "show not only that a defendant's conduct was deceptive but that the deception caused them harm," which requires a showing of reliance. *Mass. Mut. Life Ins. Co. v. Superior Ct.*, 97 Cal. App. 4th 1282, 1292 (2002), *as modified on denial of reh'g* (May 29, 2002).

Plaintiffs also allege common law fraud by concealment or omission. Under California law, to be liable for fraudulent concealment, "(1) the defendant must have concealed or suppressed a material fact, (2) the defendant must have been under a duty to disclose the fact to the plaintiff, (3) the defendant must have intentionally concealed or suppressed the fact with the intent to defraud the plaintiff, (4) the plaintiff must have been unaware of the fact and would not have acted as he did if he had known of the concealed or suppressed fact, and (5) as a result of the concealment or suppression of the fact, the plaintiff must have sustained damage." *Linear Tech. Corp v. Applied Materials, Inc.*, 152 Cal. App. 4th 115, 131 (2007). To state a claim for fraudulent omission, a plaintiff need not show purposeful suppression or concealment, however, a plaintiff must allege "an omission of a fact the defendant was obliged to disclose." *Daugherty v. Am. Honda Motor Co., Inc.*, 144 Cal. App. 4th 824, 835 (2006). Additionally, a plaintiff "must sufficiently allege that a defendant was aware of a defect at the time of sale." *Wilson*, 668 F.3d at 1145.

Under the California statutes at issue and common law, an omission is actionable "if the omitted fact is (1) contrary to a [material] representation actually made by the defendant or (2) is a fact the defendant was obliged to disclose." *Gutierrez v. Carmax Auto Superstores Cal.*, 19 Cal. App. 5th 1234, 1258 (2018) (alteration in original) (quotation marks omitted) (quoting

*Daugherty*, 144 Cal. App. 4th at 835). The omitted fact also must be material. *See id.* at 1256. Something is material "if a reasonable consumer would deem it important in determining how to act in the transaction at issue." *Id.* at 1258.

In this case, the Court previously determined that in evaluating whether Intel had a duty to disclose, the Court would apply California's "central function" standard the Ninth Circuit discussed in *Hodsdon v. Mars, Inc.*, 891 F.3d 857 (9th Cir. 2018). Under this standard, a complaint sufficiently pleads a duty to disclose for an "omission claim when: the plaintiff alleges that the omission was material; second, the plaintiff must plead that the defect was central to the product's function; and third, the plaintiff must allege one of the four *LiMandri* factors." *Hodsdon*, 891 F.3d at 863 (citing *Collins v. eMachines, Inc.*, 202 Cal. App. 4th 249, 255-58 (2011)). The *LiMandri* factors are: "(1) when the defendant is in a fiduciary relationship with the plaintiff; (2) when the defendant had exclusive knowledge of material facts not known to the plaintiff; (3) when the defendant actively conceals a material fact from the plaintiff; and (4) when the defendant makes partial representations but also suppresses some material facts." *LiMandri v. Judkins*, 52 Cal. App. 4th 326, 336 (1997) (quoting *Heliotis v. Schuman*, 181 Cal. App. 3d 646, 651 (1986)).

### 2. Omissions and Concealment

In its first motion to dismiss, Intel argued that Plaintiffs failed to allege an actionable omission because the alleged defects were publicly disclosed in the articles, white papers, and other documents described in Plaintiffs' Consolidated Class Action Complaint. The Court found that the publicly available technical articles and white papers discussed what Plaintiffs previously alleged was "Flaw Two" (Incomplete Undo) and those discussions rendered that alleged defect not an omission as that term is used in Plaintiffs' claims. *In re Intel Corp.*, 2020 WL 1495304, at *16-17.

Plaintiffs previously asserted that "Flaw One" (Unauthorized Access), which Plaintiffs described at oral argument as involving in part the fact that Intel retrieved "real values" instead of "dummy values," was not revealed in any public discussion and was concealed or suppressed. Previously, the Court relied heavily on counsel's assertions that the alleged articles, white papers, and patent filings did not cover this alleged defect and that it was unknown outside Intel. As a result, the Court found Plaintiffs had adequately this alleged defect to be an omission because it was not disclosed in the public articles or white papers. *Id.*

In the Amended Complaint, Plaintiffs call the alleged defects "Unauthorized Access" and "Incomplete Undo," instead of "Flaw One" and "Flaw Two." Plaintiffs also allege more technical articles and white papers. In ¶¶ 516-526 of the Amended Complaint, Plaintiffs describe various articles and white papers discussing security risks and potential flaws of microprocessors, mainly in Intel chips. These publicly available documents mostly discuss the microarchitecture of chips that create the risk of cache side channel attacks. Plaintiffs allege that "research papers describe cache side-channel exploits that exploit Intel's decision to lessen the security of its CPUs—while seeking additional performance to further marketing claims—and thus gain access to kernel memory and other privileged information." Am. Compl. ¶ 527. One alleged example is an Intel white paper describing how persons could use a side-channel exploit against AES cryptographic keys with the ability to "seed the cache" and "identify changes in the cache." *Id.* ¶ 517. In another alleged example, a researcher published a paper in which he used shared memory caches to retrieve confidential information, and warned Intel about the risk. *Id.* ¶ 519. Plaintiffs allege that this "is one variation of the same basic theme—an unauthorized actor exploiting the changes a process causes to the micro-architectural state of a CPU (in particular, a shared memory cache) in order to acquire another's information." *Id.* Plaintiffs also allege that

"in various patent filings Intel acknowledged the security risks caused by cache side-channel timing exploits." *Id.* ¶ 529 (describing patent filings).

The Amended Complaint alleges that Intel's knowledge of both Incomplete Undo and Unauthorized Access is evidenced by the technical articles, white papers, and patent filings. Plaintiffs' allegations in the Amended Complaint do not appear to show that only Incomplete Undo was disclosed in these public filings. When asked at oral argument whether the alleged technical articles and white papers show Intel's knowledge of Unauthorized Access, Incomplete Undo, or both, counsel for Plaintiffs responded that it was his understanding that they are evidence relating to both. *See* ECF 202 at 11:19-24. Because Plaintiffs assert that the alleged articles and white papers show Intel's knowledge of both alleged defects, it also follows that they are evidence showing "industry knowledge" of both alleged defects.

Plaintiffs appear to concede this fact, arguing that the articles, white papers, and patent filings were "unknown to the consuming public" and "are not commonly viewed by the general public buying Intel's CPUs and products containing them, given the sophisticated and specialized nature of the papers. Rather, these types of research papers are often aimed at industry insiders, such as Intel, and academics." ¶¶ 516, 528. Although Plaintiffs allege that the general public are not sophisticated enough to discover or understand such technical information, that is not enough to allege an actionable omission under the facts of this case.[4]

Information that was known in the industry is not information that the Court finds under the facts of this case that Intel fraudulently concealed or suppressed. Nor is it information that was necessarily unavailable for the general public to discover or understand. Technically

---

[4] The Court expresses no opinion on whether, were Intel aware of actual data breaches occurring as a result of its microarchitecture design and Intel and others disclosed Intel's design vulnerabilities only in technical papers, that would be sufficient disclosure.

sophisticated persons, such as technical product reviewers, can explain complicated information (or at least the effects) to the general consuming public. Further, competitors can provide consumers with information relating to a product's technical problems in a more understandable manner. Based on the allegations in the Amended Complaint that broadly allege public disclosure of the alleged defects and counsel's admission that the publicly-disclosed information relates to *both* alleged defects, the Court finds that Plaintiffs have not sufficiently alleged that Intel suppressed or concealed the alleged defects. Plaintiffs rely solely on their allegations that the information, although public, was too technical to be considered "disclosed." The Court rejects this contention. Thus, Plaintiffs have not alleged an actionable omission or concealment. Even if Plaintiffs had alleged an actionable omission, however, as discussed next, Plaintiffs have not adequately shown that Intel had a duty to disclose the alleged defects.

### 3.  Duty to disclose

Intel had a duty to disclose under California law if the alleged omissions were material, related to a "central defect," and at least one of the *LiMandri* factors was present. Intel argues that Plaintiffs' allegations meet none of these requirements. The Court focuses on whether the alleged omissions relate to a central defect.

The parties dispute what constitutes a "central defect." In discussing the central functionality test, the Ninth Circuit has explained that the alleged defect must be "*central* to the product's function." *Hodsdon*, 891 F.3d at 864 (emphasis in original). As examples of when a product's central function is affected, the Ninth Circuit noted that "[a] computer chip that corrupts the hard drive, or a laptop screen that goes dark, renders those products incapable of use by any consumer[.]" *Id.* In a footnote, the Ninth Circuit, in discussing two California cases, noted that although they did not mention central functionality, "their facts are consistent with requiring that the alleged defect be physical and important to the product's function." *Id.* at 864 n.4. The

Ninth Circuit also explained that "the central functionality of the product is not based on subjective preferences about a product." *Id.* at 864.

Intel argues that to meet the central functionality test, a defect must render the product incapable of use by any consumer. Plaintiffs argue that a central function of a product is one that is important to a reasonable consumer. Some courts, including this Court in resolving Intel's first Motion to Dismiss, have applied the "incapable of use by any consumer" test, based on the phrasing used by the Ninth Circuit in the example listed in *Hodsdon. See, e.g.*, *Oddo v. Arocaire Air Conditioning & Heating*, 2020 WL 5267917, at *25-26 (C.D. Cal. May 18, 2020); *Ahern v. Apple Inc.*, 411 F. Supp. 3d 541, 567 (N.D. Cal. 2019); *Beyer v. Symantec Corp.*, 333 F. Supp. 3d 966, 980 (N.D. Cal. 2018). Other courts have focused more on whether the alleged defect affects the product's central function, based on *Hodsdon's* description of the central functionality test, even if the product still retains overall functionality and use. *See, e.g.*, *Norcia v. Samsung Telecomms. Am., LLC*, 2018 WL 4772302 (N.D. Cal. 2018); *In re Apple Inc. Device Performance Litig.*, 386 F. Supp. 3d 1155, 1179 (N.D. Cal. 2019).

The Court, however, need not decide the precise contours of the central functionality test. Even if the test does not require that the defect render the product incapable of use by any consumer, the Ninth Circuit was clear in *Hodsdon* that the defect must be *central* and important to the *product's function* (not to a reasonable consumer, as proposed by Plaintiffs; that is materiality, which is a separate requirement). Under this baseline requirement, Plaintiffs' allegations fail.

Plaintiffs do not allege that Intel's microprocessors, as they were allegedly defective over the years, ever corrupted a hard drive, destroyed data, caused a computer to freeze or stop functioning in a meaningful way, caused a hard drive to crash, or did anything similar. Plaintiffs

allege only that for years Intel knew about its design choices that created some degree of vulnerability to an unknown set of cache timing side-channel attacks. When that vulnerability was exposed in 2018, Intel chips continued to be used in the devices that already had them installed and continued to be sold in new devices. Intel chips with these same alleged defects are still being used and sold today. Plaintiffs allege that Intel's processor design makes devices more vulnerable to potential security breaches. Plaintiffs also allege that both of the alleged defects have been in the chips since at least 2006. Consumers, thus, have been using devices with Intel's microprocessors, and with the alleged defects, for all of this time. Plaintiffs do not allege that any security breach has taken place as a result of the alleged defects.

Plaintiffs argue that a chip that is more vulnerable to a potential security breach is not performing its central function, which Plaintiffs describe as processing securely. Plaintiffs admit, however, that Intel's chips are performing their computing functions, but argue that their increased vulnerability to potential cache side-channel attacks also is central to their function. The Court disagrees. The fact that Intel's chips have for years allegedly been vulnerable to novel side-channel attacks, that were never exploited, does not go to the *central function* of the microprocessors. Since 2006, Intel's chips have performed as the "brains" of the devices in which they are placed, and they continue to do so today. Plaintiffs do not allege that any data has been breached due to the alleged defects. Under these allegations, the Court holds that the chips are performing their central function.

Plaintiffs cite *Beyer*, in which the court found that allegations about defects in Symantec's Norton security software were sufficient to survive a motion to dismiss. 333 F. Supp. 3d at 980. The court in *Beyer* found that the security software had a central function of "safeguarding computers against online threats, virus, [and] spyware." *Id.* The alleged defects in

that case "allegedly open up the operating systems to corruption, create a 'critical vulnerability' to online threats, and made computers more susceptible to cyberattacks than they would have otherwise been without the software." *Id.* The court concluded that the alleged defects go to the central function of the security software. *Id.* The security software in *Beyer*, however, was allegedly doing the opposite of what it was supposed to do and marketed to do—thereby creating security risk instead of protecting against that risk. This is distinguishable from the allegations about Intel's processors here, which are not doing the opposite of what they are supposed to be doing. They are processing and acting as the "brains" of the computer.

Plaintiffs' remaining allegations relating to the performance of the microprocessors are that the security patches implemented to mitigate the defects have caused problems with performance and have caused some of the Named Plaintiffs to reduce their use of their devices. Plaintiffs compare their devices to "comparable" devices that have had performance tests conducted and report the degraded performance test results on the comparable devices by average and highest percentage reduction in performance. Plaintiffs, however, do not allege performance degradation percentages specific to their devices.

Even assuming, however, that Plaintiffs' devices suffered reduction in performance equal to the average reduction from the comparable devices, the worst reported degradation in performance was 30 percent. A 30 percent reduction in performance of a microprocessor is insufficient to show a central function defect. Decreasing a processor's speed by 30 percent is still an infinitesimal change, and as alleged by Plaintiffs, merely means the processor is the equivalent of the previous, or older, version of Intel's chips. *Accord Hauck v. Advanced Micro Devices, Inc.*, 2018 WL 5729234, at *9 (N.D. Cal. Oct. 29, 2018) ("Plaintiffs' 'ballpark figure of five to 30 per cent slow down' after patching the computer does not rise to the level of a serious

enough defect to render the processors unfit for their ordinary purpose. This is because patching the Defect does not implicate the AMD processors' operability as computer processors, much like how the Prius' reduced mileage in the *Troup* [*v. Toyota Motor Corp.*, 545 Fed. App'x 668 (9th Cir. 2013),] case did not render the Prius unfit for its ordinary purpose. The AMD processors are certainly still operable even assuming they are patched, though the processors may be a little less efficient, much like the Priuses in *Troup*." (citation omitted)). It also cannot plausibly be argued that the previous versions of Intel's chips could not perform their central function.

At oral argument, Plaintiffs cited *Norcia*. In that case, the plaintiff alleged that the defendant, Samsung, intentionally programmed the Galaxy S4 smart phone to "fool benchmark apps and to create false perceptions regarding the speed and performance" of the phone. 2018 WL 4772302, at *1. The court found that "[n]o reasonable person could disagree that 'speed and performance' go the heart of a smartphone's central function." *Id.* at *2. The court also noted that smart phone manufacturers emphasize speed and performance in marketing phones and the plaintiff alleged that he relied on representations about speed and performance to purchase his Galaxy S4, including quoting benchmark test results, after Samsung "intentionally cheated" the benchmark apps about the phone's speed and performance. *Id.* The court held that these allegations were sufficient to meet the central functionality test, based on Samsung's "manipulation" of the material fact of the speed and performance data that was in Samsung's exclusive knowledge. *Id.*

Plaintiffs argue that Intel failed to disclose its chips' security vulnerabilities, just like Samsung failed to disclose its falsification of the Galaxy S4's manipulated speed and performance in *Norcia*. The two allegations are different, however, because the underlying

omission is different. The court in *Norcia* found that the falsification about speed and performance went to "heart" of a cell phone's functionality. An omission about possible vulnerability to novel, still unexploited side-channel attacks does not go the heart of the function of a microprocessor. To the extent that Plaintiffs argue that their allegations about speed and performance are similar to those of the plaintiffs in *Norcia*, those are also distinguishable. Plaintiffs do not allege that Intel falsified or manipulated the data about its processor speed and performance. Plaintiffs only allege that Intel made design choices to sacrifice security against potential side-channel attacks that had not yet been discovered to improve *actual* processing speed and performance. Plaintiffs do not accuse Intel of making any false or manipulated processing speed or performance representations.

Because Plaintiffs' allegations do not show that the alleged defects were central to the functionality of Intel's microprocessors, the Court does not address whether any of the *LiMandri* factors apply. Plaintiffs' Amended Complaint fails adequately to allege that the defects involved a central function of Intel's processors. Thus, Plaintiffs fail to allege a duty to disclose and fail to allege fraud, a claim under the UCL fraud prong, a claim under the FAL, or a claim under the CLRA. Because the Court previously provided Plaintiffs with a detailed analysis of the deficiencies in pleading these claims and the opportunity to cure those deficiencies, these claims are dismissed with prejudice.

**B. Nationwide Claim—UCL Unlawful or Unfair Practice**

California's UCL is written in the disjunctive and "establishes three varieties of unfair competition–acts or practices which are unlawful, or unfair, or fraudulent." *Cel-Tech Commc'ns, Inc. v. L.A. Cellular Tel. Co.*, 20 Cal. 4th 163, 180 (1999). "The statutory language referring to 'any unlawful, unfair *or* fraudulent' practice makes clear that a practice may be deemed unfair even if not specifically proscribed by some other law. . . . In other words, a practice is prohibited

as 'unfair' or 'deceptive' even if not 'unlawful' and vice versa." *Id.* (emphasis in original) (citations omitted). As discussed above, Plaintiffs fail to plead a UCL claim under the "fraud" prong. The Court now turns to the "unlawful" and "unfair" prongs of the UCL.

### 1. Unlawful

By proscribing "unlawful" acts or practices, "the UCL borrows violations of other laws and treats them as unlawful practices that the UCL makes independently actionable." *Gutierrez*, 19 Cal. App. 5th at 1265. "Virtually any law or regulation—federal or state, statutory or common law—can serve as a predicate for a section 17200 'unlawful' violation." *Klein v. Chevron U.S.A., Inc.*, 202 Cal. App. 4th 1342, 1383 (2012), *as modified on denial of reh'g* (Feb. 24, 2012) (simplified). Because Plaintiffs fail adequately to allege a violation of another law, Plaintiffs fail to allege a violation of the "unlawful" prong of the UCL. Because this also was previously dismissed with leave to amend, this claim is dismissed with prejudice.

### 2. Unfair

"[T]he proper definition of 'unfair' conduct against consumers 'is currently in flux' among California courts." *Davis v. HSBC Bank Nev., N.A.*, 691 F.3d 1152, 1169 (9th Cir. 2012) (quoting *Lozano v. AT&T Wireless Servs., Inc.*, 504 F.3d 718 735 (9th Cir. 2007)). The California appellate courts have articulated three tests for defining "unfair"—the "balancing test," the "tethering test," and the test from the Federal Trade Commission Act ("FTC Act"). *See Drum v. San Fernando Valley Bar Ass'n*, 182 Cal. App. 4th 247, 257 (2010). As discussed in the Court's Opinion and Order resolving Intel's first Motion to Dismiss, the Court applies the balancing test. *In re Intel Corp.*, 2020 WL 1495304, at *22. This test asks whether the alleged practice "violates established public policy or if it is immoral, unethical, oppressive or unscrupulous and causes injury to consumers which outweighs its benefits.*" McKell v. Wash. Mut., Inc.*, 142 Cal. App. 4th 1457, 1473 (2006). It requires the court to weigh the utility of the

defendant's conduct against the gravity of the harm to the alleged victim. *Drum*, 182 Cal. App. 4th at 257.

The Court previously found that if Plaintiffs alleged standing (which Intel does not challenge in the pending motion), Plaintiffs sufficiently allege a UCL claim under the unfair prong at this stage of the litigation under the balancing test, particularly given that it is generally not appropriate to resolve this claim on a motion to dismiss. *See McKell*, 142 Cal. App. 4th at 1473 ("[T]he determination whether [a practice] is unfair is one of fact which requires a review of the evidence from both parties. . . . It thus cannot usually be made on demurrer." (citation omitted)); *Grace v. Apple Inc.*, 2017 WL 3232464, at \*15 (N.D. Cal. July 28, 2017) ("However, Apple's argument that Plaintiffs' alleged injury is outweighed by Apple's business justifications is not suitable for resolution on a motion to dismiss. . . . While the benefits of Apple's conduct may ultimately outweigh the harm to consumers, this is a factual determination that cannot be made at this stage of the proceedings." (quotation marks omitted)); *Backus v. Gen. Mills, Inc.*, 122 F. Supp. 3d 909, 929 (N.D. Cal. 2015) ("Courts are reluctant to grant motions to dismiss 'unfair' UCL claims under the balancing test, because the test involves weighing evidence that is not yet properly before the court."); *In re Carrier IQ, Inc.*, 78 F. Supp. 3d 1051, 1117 (N.D. Cal. 2015) ("The cost-benefit analysis this test calls for is not properly suited for resolution at the pleading stage."); *accord Williams v. Gerber Prods. Co.*, 552 F.3d 934, 939 (9th Cir. 2008) (noting that only "occasionally" have dismissals of UCL claims on a motion to dismiss been upheld and that it is a "rare situation in which granting a motion to dismiss is appropriate").

The Court's previous determination, however, was based on the fact that the Court had found that Plaintiffs had adequately alleged a material omission. The Court now finds that

Plaintiffs fail adequately to allege a material omission, because both Unauthorized Access and Incomplete Undo were known in the industry through technical articles and white papers. Without an actionable omission, the Court finds that Plaintiffs also fail to allege conduct supporting a claim that Intel engaged in unfair conduct. This dismissal, however, is without prejudice. Plaintiffs have leave to replead how the alleged conduct is unfair without an underlying omission or to allege, if they can, that the Unauthorized Access defect was not publicly disclosed, contrary to Plaintiffs' current allegations and admissions, and thus was an omission.

Intel also argues that under the Ninth Circuit's recent decision *Sonner v. Premier Nutrition Corp.*, 971 F.3d 834 (9th Cir. 2020), the Court should dismiss Plaintiffs' California statutory claims. In *Sonner*, the Ninth Circuit held "that the traditional principles governing equitable remedies in federal courts, including the requisite inadequacy of legal remedies, apply when a party requests restitution under the UCL and CLRA in a diversity action." 971 F.3d at 844. The Ninth Circuit reasoned that "[i]t has been a fundamental principle for well over a century that state law cannot expand or limit a federal court's equitable authority." *Id.* at 841. The Ninth Circuit affirmed the district court's dismissal of the plaintiff's UCL claim because the plaintiff "fail[ed] to demonstrate that she lacks an adequate legal remedy." *Id.* at 845.

Intel argues that because Plaintiffs have not alleged that they do not have an adequate legal remedy, they have not sufficiently alleged an equitable claim under the UCL. The Court agrees. *See, e.g.*, *Williams v. Apple, Inc.*, 2020 WL 6743911, at *9 (N.D. Cal. Nov. 17, 2020). Because, however, Plaintiffs filed their Amended Complaint before the Ninth Circuit issued its opinion in *Sonner*, the Court dismisses this claim also with leave to amend so that Plaintiffs may explain why they do not have an adequate remedy at law. *See, e.g.*, *In re JUUL Labs, Inc., Mktg.,*

*Sales Pracs., & Prod. Liab. Litig.*, 2020 WL 6271173, at *55 (N.D. Cal. Oct. 23, 2020); *Teresa*

*Adams v. Cole Haan, LLC*, 2020 WL 5648605, at *4 (C.D. Cal. Sept. 3, 2020).

## C.  Nationwide Claim—Quasi-Contract or Unjust Enrichment

The Court previously held that if Plaintiffs could allege standing, they could allege a

claim for unjust enrichment or quasi-contract. As with Plaintiffs' claim under the UCL based on

unfair conduct, however, this holding depended on an initial finding that Plaintiffs alleged a

material omission. Like Plaintiffs' unfair conduct claim under the UCL, without an actionable

omission, Plaintiffs need to allege why Intel's retention of the benefit conferred is unjust.

Intel also argues in a footnote that because this claim seeks an equitable remedy, it fails

under *Sonner*. Plaintiffs respond that *Sonner* involved an amended complaint and motion to

dismiss at a much later stage in the litigation than does this case. Courts have rejected this

argument. *See, e.g.*, *Zaback v. Kellogg Sales Co.*, 2020 WL 6381987, at *4 (S.D. Cal. Oct. 29,

2020) ("Zaback also argues *Sonner* is distinguishable because the amendment of the complaint

and motion to dismiss came at an unusually late stage in litigation. This is incorrect. Nothing in

*Sonner* limits its precedential value to such circumstances." (citation omitted)). The Court agrees

that *Sonner* is not so limited.

Plaintiffs also argue that they may plead unjust enrichment in the alternative. Plaintiffs

are correct that they may allege unjust enrichment in the alternative to legal claims. *See Astiana*

*v. Hain Celestial Grp., Inc.*, 783 F.3d 753, 762-63 (9th Cir. 2015). "The clear rule in *Sonner*,"

however, is "that plaintiffs must plead the inadequacy of legal remedies before requesting

equitable relief." *Teresa Adams*, 2020 WL 5648605, at *2; *see also In re MacBook Keyboard*

*Litig.*, 2020 WL 6047253, at *3 (N.D. Cal. Oct. 13, 2020) ("This Court agrees with our fellow

courts that under *Sonner*, Plaintiffs are required to allege that they lack an adequate remedy at

law in order to seek injunctive relief."). Plaintiffs have not alleged, even in the alternative, that

they do not have adequate legal remedies. Thus, Plaintiffs' unjust enrichment claims are dismissed, with leave to amend.

## D.  State Subclass Claims

Intel argues that Plaintiffs fail to state a claim under the state subclass claims, which are brought under the consumer protection laws of all states but California, Kentucky, and Massachusetts, plus the District of Columbia. The parties agreed to litigate in the pending motion six bellwether counts under the consumer protection laws of Florida, Illinois, New Jersey, New York, Ohio, and Texas.

### 1.  All Bellwether Deceptive Practices Claims Based on Misrepresentations

Intel argues that for the bellwether claims based on alleged misrepresentations, Plaintiffs' claims fail because no Named Plaintiff alleges that they saw or heard any of the alleged statements by Intel. Intel cites cases from each of the bellwether jurisdictions for which the parties agreed to litigate a claim based on misrepresentations.

For claims under Florida law, Intel cites *Hall v. Sea World Entm't, Inc.*, 2015 WL 9659911, at *16 (S.D. Cal. Dec. 23, 2015). The court in *Hall* explained that "the Orlando Plaintiffs' failure to specifically allege that they viewed any SeaWorld statements or advertisements prior to purchasing their tickets precludes standing to challenge such advertisements under FDUPTA." *Id.* (citing *In re NJOY, Inc. Consumer Class Action Litig.*, 2015 WL 4881091, at *22 (C.D. Cal. Aug. 14, 2015) ("[W]here a plaintiff has not seen or heard an allegedly deceptive advertisement, she cannot challenge it under the FDUTPA." (alteration added in *Hall*))).

For claims under New York law, NYGBL § 349, Intel cites *Szymczak v. Nissan N. Am. Inc.*, 2011 WL 7095432 (S.D.N.Y. Dec. 16, 2011) and *Woods v. Maytag Co.*, 2010 WL 4314313,

at *16 (E.D.N.Y. Nov. 2, 2010).[5] "To state a claim under [§ 349], a plaintiff must allege that the defendant has engaged in an act or practice that is deceptive or misleading in a material way and that plaintiff has been injured by reason thereof." *Small v. Lorillard Tobacco Co.*, 94 N.Y.2d 43, 55 (1999) (quotation marks omitted). "Intent to defraud and justifiable reliance by the plaintiff are not elements of the statutory claim." *Id.* The court in *Szymczak* dismissed the § 349 claims of the plaintiffs who did not allege that they bought vehicles from the defendants but refused to dismiss the claims of the plaintiffs who did allege that they bought vehicles from the defendants. *Szymczak*, 2011 WL 7095432, at *15-16. In dismissing the claims, the court determined that although a plaintiff in a § 349 case need not meet the requirements of Rule 9(b), the plaintiff "must still allege receipt of or exposure to the misleading practice or act." *Id.*

For claims under the NJCFA, Intel cites *Rosenthal v. Sharkninja Operating LLC*, 2016 WL 7338535, at *3-4 (D.N.J. Dec. 19, 2016). The court in *Rosenthal* explained:

> Misrepresentations made to the public generally but not the plaintiff do not bear a sufficient nexus to an individual plaintiff's purchase and loss to satisfy the Consumer Fraud Act. Furthermore, while the plaintiff need not prove reliance, for CFA claims based on affirmative representation there must be a direct causal connection between the misrepresentation and the plaintiff's defeated expectations about the product.
>
> * * *

---

[5] *Woods* does not support Intel's argument. The court in *Woods* dismissed the plaintiffs' § 349 claim because the plaintiffs did not assert the claim with specificity and instead only vaguely alleged that the defendant "knowingly misrepresented material facts regarding the safety and use of said Maytag oven in an effort to induce plaintiffs and the public at large to purchase said oven." 2010 WL 4314313, at *15. The court in *Woods* concluded that "[a]lthough the Plaintiff does not need to allege these facts with the same level of specificity as a fraud claim, general references to advertisements and statements will not be sufficient to allege a deceptive act or practice." *Id.* at *16. Plaintiffs provide detailed allegations and the Amended Complaint does not suffer from a lack of specificity.

> The fact that advertisements existed and were "pervasive" is
> insufficient to establish a nexus to Plaintiff's purchase.

*Id.* (simplified).

The TDTPA requires reliance. Tex. Bus. & Com. Code Ann. § 17.50(a)(1)(B). Plaintiffs allege that Intel issued marketing materials and other publications that contained misrepresentations and half-truths. "In order for a consumer to maintain an action for this violation, the consumer must show that the misrepresentation was a producing cause of his or her damages and that the consumer relied on the misrepresentation to his or her detriment." *McLaughlin, Inc. v. Northstar Drilling Techs., Inc.*, 138 S.W.3d 24, 30 (Tex. App. 2004); *see also Deburro v. Apple, Inc.*, 2013 WL 5917665, at *5 (W.D. Tex. Oct. 31, 2013) ("Additionally, Plaintiffs have not pleaded reliance, as neither Plaintiff claims to have seen any of the representations listed in the Second Amended Complaint prior to purchasing a MacBook Pro, nor have Plaintiffs alleged such representations actually induced them to purchase the product."). Intel argues that Plaintiffs' failure to allege that the Texas Named Plaintiff saw or heard the alleged misrepresentations requires dismissal of Plaintiffs' deceptive practices claim based on misrepresentations.

Under Illinois law, Intel cites *De Bouse v. Bayer AG*, 922 N.E.2d 309 (Ill. 2009). The court in *De Bouse* reviewed a line of cases on proximate cause under the ICFA and concluded:

> The basic principle in each of the foregoing cases is that to
> maintain an action under the Act, the plaintiff must actually be
> deceived by a statement or omission that is made by the defendant.
> If a consumer has neither seen nor heard any such statement, then
> she cannot have relied on the statement and, consequently, cannot
> prove proximate cause.
>
> * * *
>
> Instead we have repeatedly emphasized that in a consumer fraud
> action, the plaintiff must actually be deceived by a statement or
> omission. If there has been no communication with the plaintiff,

> there have been no statements and no omissions. In such a
> situation, a plaintiff cannot prove proximate cause. We therefore
> answer the first certified question in the negative. A consumer
> cannot maintain an action under the Illinois Consumer Fraud Act
> when the plaintiff does not receive, directly or indirectly,
> communication or advertising from the defendant.

*Id.* at 316; *see also Zak v. Bose Corp.*, 2019 WL 1437909, at *5 (N.D. Ill. Mar. 31, 2019) ("The

Illinois Supreme Court has clarified that in an ICFA action, 'the plaintiff must actually be

deceived by a statement or omission,' which in turn requires that the plaintiff received some sort

of communication from the defendant." (quoting *De Bouse*, 922 N.E. 2d at 316)).

Intel raises the same challenge against the affirmative misrepresentation claim under

Ohio law as Intel raises against the other state bellwether misrepresentation claims—that any

Named Plaintiff (of which there is none at this time) must allege that he or she saw or heard

Intel's alleged misrepresentations. Intel cites *Marlowe v. Nature's Bounty Co.*, 2017

WL 2291683, at *2 (N.D. Ohio May 25, 2017) (OCSPA requires plaintiff to allege that she "was

aware of the alleged misrepresentation before or during the purchase" to satisfy the statute's

causation requirement).

Plaintiffs allege that a Named Plaintiff from Florida relied on a representation by Intel

that its processors had "superior performance, speed, and security and were fit for use in its

servers, PCs, and other devices that store, process or access sensitive, confidential, and personal

information and data." Plaintiffs allege that a Named Plaintiff from Illinois relied on a

representation that Intel processors had "advanced performance" and another Named Plaintiff

from Illinois relied on representations that Intel processors were "the world's fastest" and were

"an industry performance leader." Plaintiffs also allege that a Named Plaintiff from New Jersey

relied on representations that Intel processors had "advanced performance" and "were faster" and

another Named Plaintiff relied on representations that Intel processors "were the world's fastest

processors." For New York, Plaintiffs allege that a Named Plaintiff relied on representations "that Intel processors were the world's fastest processors and were the best on the market/performance leaders." Finally, for Texas, Plaintiffs allege that a Named Plaintiff relied on representations that Intel processors were the "world's fastest processors, had amazing performance consumers could see and feel, were the industry performance leader and had advanced performance."

Plaintiffs argue that for states, such as New York, where no reliance is required, Plaintiffs do not have to allege that the Named Plaintiffs saw or heard the alleged misrepresentations to state a claim. The Court disagrees. As discussed by the court in *Rosenthal*, in discussing the similar New Jersey law in which reliance is not required, it is the causal requirement in a deceptive practices act claim that mandates the plaintiff to allege exposure to the alleged misrepresentation. 2016 WL 7338535, at *4. A misrepresentation cannot injure a plaintiff "by reason thereof" if a plaintiff never saw or heard the alleged statement. *Small*, 94 N.Y.2d at 55. The Illinois Supreme Court in *De Bouse* similarly discussed that proximate cause cannot be met without a plaintiff's exposure to the allegedly deceptive conduct. 922 N.E.2d at 316.

Plaintiffs' allegations about what the Named Plaintiffs from the bellwether jurisdictions allegedly saw and heard are insufficient to support Plaintiffs' alleged deceptive practices claims based on misrepresentations. Plaintiffs specifically allege security-related representations in ¶¶ 499-501 of the Amended Complaint, but none of the Named Plaintiffs allege that they saw or heard any of those specific security-related alleged misrepresentations. The representations that the Named Plaintiffs alleged that they saw or heard are either general statements about speed or performance, which are unrelated to security, are too vague and general to be actionable, or are mere puffery. The Court rejects Plaintiffs' argument that representations about speed or

performance "implicitly" contain a representation related to security. These claims are dismissed without prejudice.

### 2.  All Bellwether Deceptive Practices Claims Based on Omissions

In resolving Intel's first Motion to Dismiss, the Court found that if Plaintiffs could allege standing, they could allege state-specific claims for deceptive practices based on omissions for most states—even states that require a duty to disclose because Intel did not argue that California's "central function" test applied in any other state. *In re Intel*, 2020 WL 1495304, at *26-30. That finding, however, was based on the Court's previous conclusion that Plaintiffs sufficiently alleged a material omission because the alleged defect now called Unauthorized Access had not been disclosed. Because the Court now finds that Plaintiffs fail to allege an actionable omission because both defects were known in the industry, Plaintiffs fail to allege any state subclass claim based on an omission. Like with Plaintiffs' unfair claim under the UCL, Plaintiffs have leave to amend these claims if they can allege that the Unauthorized Access defect was not publicly disclosed, contrary to Plaintiffs' current allegations and admissions.

### 3.  All Remaining Bellwether Claims

The remaining state bellwether claims include claims for unfair conduct (Florida, Illinois, Ohio), and unconscionable conduct (Florida, New Jersey, Texas, Ohio). Because the Court has found that Plaintiffs fail to allege any actionable omissions or misrepresentations, Plaintiffs fail to allege any conduct by Intel supporting a claim for alleged unfair conduct or unconscionable conduct under these statutes. These claims are dismissed with leave to amend.

### 4.  Ohio—Absence of a Named Plaintiff

Intel also moves to dismiss the claims based on Ohio law because there is no Named Plaintiff who resides in Ohio. Intel relies on the Court's previous Opinion and Order citing *Pardini v. Unilever U.S., Inc.*, 961 F. Supp. 2d 1048, 1061 (N.D. Cal. 2013), and dismissing

subclass claims under the law of the U.S. Virgin Islands because no Named Plaintiff resided in

that jurisdiction. Plaintiffs respond that courts routinely defer this type of analysis until class

certification. *See* ECF 192 at 60-61 and n.31 (citing cases). As pointed out by Plaintiffs, many

courts have found similar to what the Southern District of New York explained, that when a

"Defendant asserts that the existing Plaintiffs lack standing to bring their consumer protection

claims under the laws of states in which they do not reside . . . . The better course at this junction

is to let the claims go forward and see what happens on the motion for class certification. This is

consistent with a broad array of precedent and persuasive authority." *Blessing v. Sirius XM Radio*

*Inc.*, 756 F. Supp. 2d 445, 450-51 (S.D.N.Y. 2010). The Court finds persuasive the authorities

cited by Plaintiffs and declines to dismiss the Ohio claims on this basis at this time.

## CONCLUSION

The Court GRANTS Intel's Motion to Dismiss the Amended Complaint (ECF 190). The

Court gives Plaintiffs LEAVE TO AMEND, within 28 days from the date of this Opinion and

Order, only the following: (a) Plaintiffs' Nationwide claim under California's Unfair

Competition Law alleging unfair conduct; (b) Plaintiffs' Nationwide claim for unjust

enrichment; and (c) Plaintiffs' state subclass claims. The Court directs the Clerk of the Court to

send a copy of this Opinion and Order to the Clerk of the Judicial Panel on Multidistrict

Litigation.

**IT IS SO ORDERED**.

DATED this 29th day of March, 2021.

/s/ *Michael H. Simon*
Michael H. Simon
United States District Judge